**FILED**

**JUN 2 7 2006**

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| SURALEB, INC., | ) | |
| | ) | |
| *Petitioner,* | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| PRODUCTION ASSOCIATION "MINSK TRACTOR WORKS," REPUBLIC OF BELARUS, | ) ) ) | **06CV3496** **JUDGE MAROVICH** |
| | ) | **MAG. JUDGE BROWN** |
| *Respondent.* | ) | |

## PETITION TO CONFIRM FOREIGN ARBITRATION AWARD
## AND FOR ENTRY OF FINAL JUDGMENT

Suraleb, Inc., by its attorneys, Sachnoff & Weaver, Ltd. and Rosenfeld Hafron Shapiro & Farmer, brings this Petition to summarily confirm a final arbitration award entered on May 31, 2006 in Stockholm, Sweden, and for entry of a final judgment on the award.

1.     This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, as ratified by the United States and codified at 9 U.S.C. §§ 901-908. In addition, diversity jurisdiction exists pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs, and involves a dispute between an Illinois corporation and a foreign state enterprise.

2.     Petitioner, Suraleb, Inc. ("Suraleb"), is an Illinois corporation with its principal place of business in the State of Illinois.

3.      Respondent, Production Association "Minsk Tractor Works," Republic of Belarus ("MTW"), is a state enterprise acting in accordance with the legislation of the Republic of Belarus and controlled by the government of the Republic of Belarus.

4.      Suraleb and MTW entered into a binding agreement dated April 28, 2000, by which MTW retained Suraleb to collect various outstanding debts on its behalf in the United States and Canada. MTW agreed to pay Suraleb a fee in exchange for these services. A true and correct copy of the April 28, 2000 Agreement is attached hereto as Exhibit A.

5.      Section 6.1. of the parties' Agreement provided, in relevant part:

> All disputes under this Agreement shall be resolved by way of negotiations between the parties. If the parties do not agree, all the disputes shall be resolved by arbitration by a panel of three arbitrators under the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL). The site of the arbitration shall be Stockholm, Sweden. All appointments shall be by the Chamber of Commerce of Sweden. . . .

(Ex. A.)

6.      In 2003, a fee dispute arose between the parties, which resulted in Suraleb filing an arbitration proceeding in Stockholm, Sweden pursuant to the terms of the Agreement. The Chamber of Commerce of Sweden appointed three qualified arbitrators to hear the case, namely: Per Runeland, Bo G.H. Nilsson and Rolf Olofsson.

7.      The arbitration proceeding involved more than two years of extensive written and oral submissions on Suraleb's claims and MTW's counterclaims, including a full hearing in December 2005 at which fact and expert witnesses for both sides testified. MTW was represented in the arbitration by the U.S. law firm of McDermott Will & Emery LLP and the Swedish law firm of Advokatfirman Lindahl KB.

8.      On May 31, 2006, the Tribunal rendered a Final Award. A true and correct copy of this Final Award is attached hereto as Exhibit B.

2

9.     Among other things, the Final Award ordered MTW to pay Suraleb:

(i)     a fee of US$2,166,555.00;

(ii)    prejudgment interest on this amount at five percent per annum for the period from April 13, 2003 until May 31, 2006 (US$339,230.97);

(iii)   US$987,224.61 for the cost of legal representation in the arbitration; and

(iv)    1,203,761 Swedish Kronor representing costs of the arbitration (which equates to US$163,747.07 at the exchange rate on June 14, 2006).

(Ex. B at 38-39.)  The total for all these items is US$3,656,757.65.

10.    Despite Suraleb's written demand to MTW to satisfy this Final Award, MTW has not paid any of the amounts awarded to Suraleb.

**WHEREFORE**, Suraleb, Inc. respectfully requests that the Court: (1) confirm the May 31, 2006 Final Award; (2) enter judgment in favor of Suraleb and against MTW in the amount of US$3,656,757.65; (3) enter an award of post-judgment interest for the period after May 31, 2006, at the appropriate statutory rate; and (4) award such further relief as the Court deems just and equitable.

Dated:  June 27, 2006

Respectfully submitted,

**SURALEB, INC.**, *Petitioner*

By: _____
       One of Its Attorneys

J. Samuel Tenenbaum
Barry S. Rosen
Henry Pietrkowski
SACHNOFF & WEAVER, LTD.
10 S. Wacker Drive
40th Floor
Chicago, Illinois 60606
Tel:  (312) 207-1000
Fax:  (312) 207-6400

Norman L. Hafron
ROSENFELD HAFRON SHAPIRO & FARMER
221 N. LaSalle St.
Suite 1763
Chicago, IL 60601
Tel:  (312) 372-6058
Fax:  (312) 641-3139

*Attorneys for Suraleb, Inc.*

3

# EXHIBIT A

IN   NATIONAL EARTHMOVER 6305798   P.02

## СОГЛАШЕНИЕ
г. Минск   № 213/-06/10

Производственное объединение "Минский тракторный завод" Минск, Республика Беларусь, именуемое в дальнейшем МТЗ, и фирма SURALEB Inc., Чикаго, США, именуемая в дальнейшем SURALEB, заключили настоящее соглашение 28 апреля 2000 года.

### 1. Общие положения

1.1.  МТЗ – государственное предприятие, действующее в соответствии с законодательством Республики Беларусь и контролируемое правительством Республики Беларусь.

1.2.  МТЗ реализует свою продукцию в США через компанию "Belarus Machinery Inc." (Милуоки, Висконсин, США) – далее ВМI, а в Канаде через компанию "Belarus Equipment of Canada Ltd." (Торонто, Онтарио, Канада) – далее ВЕС.

1.3. МТЗ владеет 10% акций ВМI, остальные 90% принадлежат АТЭКС.

1.4. АТЭКС – открытое акционерное общество "Автотракторэкспорт" (Москва, Российская Федерация).

1.5. АТЭКС владеет 100% акций ВЕС.

1.6. ВМI, по состоянию на 03.11.99 должна МТЗ 28 489 270,02 USD за продукцию, полученную ею от МТЗ.

1.7. ВЕС по состоянию на 03.11.99 должна МТЗ 9 538 439,49 CAD и 2 974 542,50 USD за продукцию, полученную ею от МТЗ.

1.8. МТЗ предпринимало неоднократные попытки в течение длительного времени взыскать долг с ВМI и ВЕС, в том числе и через АТЭКС.

1.9. МТЗ не получил ни одного предложения, которое было бы

## AGREEMENT
№ 213/-06/10   Minsk

Production Association "Minsk Tractor Works", Minsk, Republic of Belarus, hereinafter referred to as MTW, on the one part, and company SURALEB Inc., Chicago, USA, hereinafter referred to as SURALEB on the other part, have concluded the present Contract on April 28 2000 as follows:

### 1. General Provisions

1.1. MTW - a state enterprise acting in accordance with the legislation of the Republic of Belarus and controlled by the government of the Republic of Belarus.

1.2. MTW markets its products in USA through the company "Belarus Machinery Inc." (Milwaukee, Wisconsin, USA) - hereinafter BMI, and in Canada through the company "Belarus Equipment of Canada Ltd." (Toronto, Ontario, Canada) - hereinafter BEC.

1.3. MTW owns 10% of shares of BMI, other 90% belong to ATEX.

1.4. ATEX - an open joint stock company "Avtotractoroexport" (Moscow, Russian Federation).

1.5. ATEX owns 100% of shares of BEC.

1.6. As of 11.03.99 BMI owes MTW $28.489.270,02 for the goods it has received from MTW.

1.7. As of 11.03.99 BEC owes MTW CAD9.538.439,49 and US$2.974.542,50 for the goods it has received from MTW.

1.8. MTW has undertaken numerous efforts, including those made through ATEX, over a lengthly period of time to collect the BMI and BEC debts.

1.9. MTW has not received any offer which could be acceptable to it with respect to

EXHIBIT
0003

приемлемым для него относительно взыскания долга ВМІ и ВЕС и понимает, что решить вопрос мирным путем не представляется возможным.

1.10. В связи с этим МТЗ возбудил иск против ВЕС в суде г.Торонто, Онтарио, Канада 17.08.98г. и намерен возбудить иск против ВМІ.

1.11. ВЕС в целях защиты выставил встречный иск против МТЗ с претензиями по качеству продукции, полученной от МТЗ.

1.12. Судебный процесс по иску МТЗ безосновательно затянулся более чем на 1,5 года без четкой перспективы быстрого и положительного завершения.

1.13. В связи с вышеуказанным МТЗ намерен расторгнуть отношения с Equipment Consultants, a Division of Tri Sun Ventures Inc., защищающей в настоящее время интересы МТЗ в Канаде.

1.14. ВМІ в целях защиты, в связи с угрозой иска к ней МТЗ и связанными с ним для нее последствиями, обратилась в суд г.Милуоки с заявлением согласно главы 11 законодательства о банкротстве.

1.15. МТЗ намерен поручить компании, находящейся в США, взыскать задолженность с ВМІ и ВЕС в максимально возможном объеме с вынесением судебного решения о банкротстве и ликвидации ВМІ и ВЕС, при этом обязательным условием должно быть передача МТЗ товарного знака "Belarus" и других неосязаемых активов ВМІ и ВЕС для возможности незамедлительного возобновления реализации продукции МТЗ в США и Канаде.

1.16. Такой американской компанией,

collection of the BMI and BEC debts and understands that it is not possible to settle this matter.

1.10. In relation to this on the 08.17.98 MTW commenced legal proceedings against BEC in the court of Toronto, Ontario, Canada and intends to start legal proceedings against BMI.

1.11. BEC in order to defend itself issued a cross action with references to the quality of products received from MTW.

1.12. Legal proceedings for MTW petition has been without any reasons protracted for more than 1.5 years without a clear prospect of quick and positive conclusion.

1.13. Taking into account the above mentioned MTW intends to cancel relations with Equipment Consultants, a Division of Tri Sun Ventures Inc., at present protecting MTW interests in Canada.

1.14. BMI for defense purposes because of the threat of law suite from MTW against it and its related consequences to it applied to the court in Milwaukee with a petition according to Chapter 11 of the bankruptcy legislation.

1.15. MTW intends to assign a company in the USA to collect BMI and BEC debt in maximum possible amount with a court order about bankruptcy and liquidation of BMI and BEC, with mandatory condition of transfer to MTW of the "Belarus" trade mark and other BMI and BEC intangible assets to facilitate immediate renewal of marketing MTW products in the USA and in Canada.

согласившейся сотрудничать с МТЗ по востребованию задолженности BMI и BEC, а также по возобновлению продаж продукции МТЗ в США и Канаде, включая и финансирование их на этапе восстановления, является SURALEB.

1.17. МТЗ поручил представлять его интересы в США и Канаде Савицкому В.Г. – зам. маркетинг директору МТЗ и Жуковой Е.Л. – начальнику юридического отдела МТЗ, на основании выданных им доверенностей, которые дают полномочия выполнять все необходимые действия, связанные с взысканием долгов BMI и BEC, включая, но не ограничиваясь пунктами данного соглашения.

1.18. От имени SURALEB по данному соглашению действует Ричард Шульке, имеющий все полномочия как глава этой компании, несущий полную ответственность за действия SURALEB по данному соглашению.


## 2. Предмет соглашения

2.1. МТЗ предоставляет SURALEB, а SURALEB принимает на себя полномочия представлять интересы МТЗ по взысканию в пользу последнего задолженности BMI и BEC за продукцию, полученную ими от МТЗ и неоплаченную.

## 3. Обязанности сторон.

3.1. МТЗ обязуется:

3.1.1. Передать SURALEB все свои права по сбору долгов BMI и BEC в интересах МТЗ, а также по возвращению товарного знака "Belarus" в США и Канаде под полный контроль МТЗ, и предоставить полномочия предпринимать любые необходимые действия для этого, в том числе и в судебном порядке в интересах МТЗ в отношении BMI, BEC и их руководителей, а также в отношении любых других юридических и

1.16. Such American company that agreed to co-operate with MTW in collecting BMI and BEC debts and to renew marketing of MTW products in the USA and in Canada, including its financing at the beginning is SURALEB.

1.17. To represent its interests in the USA and in Canada MTW assigned Mr. V.G.Savitski -Deputy Marketing Director MTW and Mrs. E.L.Zoukova Chief of Juridical Department MTW on the basis of their powers of attorney, which authorize them to fulfill all the necessary actions related to collecting BMI and BEC debts including but not limited by the paragraphs of this Agreement.

1.18. On behalf of SURALEB in accordance with this Agreement acts Mr. Richard Schuelke, who has all the authority as a Head of this company and bears full responsibility for the SURALEB activity under this Agreement.

## 2. Subject of the Agreement

2.1 MTW gives authority to SURALEB and SURALEB undertakes to represent MTW's interests in collecting for its benefit the BMI and BEC debts for the products they received form MTW and have not paid for.

## 3. Undertakings

3.1. MTW undertakes:

3.1.1. To transfer to SURALEB all its rights for collecting BMI and BEC debts in the interests of MTW and returning MTW's trade mark "Belarus" in the USA and Canada under total MTW control; and to give the authority to undertake any necessary actions in this respect including those in court in the interests of MTW against BMI and BEC and their management as well as against any other juridical and physical persons responsible for BMI and BEC debts to MTW; and to

4

физических лиц, причастных к долгам BMI и BEC перед МТЗ, и будет оказывать в этом необходимую помощь.

3.1.2. Предоставить SURALEB для ведения дела копии всех документов, касающихся задолженности BMI и BEC перед МТЗ, таких как:

- контракты, подтверждающие задолженность,
- банковские документы,
- переписка с BMI и BEC, имеющая отношение к взыскиваемому долгу,
- информация, имеющая отношение к взыскиваемому долгу по запросам SURALEB (срочное предоставление)
- все любые другие документы, относящиеся к делу по требованию SURALEB.

3.1.3 Предоставить возможность SURALEB опрашивать работников МТЗ для получения показаний, которые по усмотрению SURALEB могут быть использованы в связи с ведением дела по взысканию долга с BMI и BEC, в том числе и в судебных заседаниях.

3.1.4. Не поручать любым другим организациям, сторонам или представителям выполнение работ, которые могут нанести ущерб действиям SURALEB и повлиять на результат этого Соглашения.

3.1.5. Немедленно информировать SURALEB о всех изменениях в отношениях МТЗ с BMI и BEC, о попытках найти решение возвращения задолженности, обо всех контактах.

3.1.6. Согласиться с тем, что все средства (деньги и активы в денежном выражении), взысканные SURALEB или с его помощью с BMI и BEC, уменьшающие их задолженность перед МТЗ, будут переведены на счет МТЗ или переданы под его абсолютный контроль, за исключением гонорара SURALEB, в размере и порядке, определяемых разделом 3.2.9. настоящего Соглашения.

3.1.7. Предоставить SURALEB возможность активного участия в

give all necessary assistance in this respect.

3.1.2. To present to SURALEB copies of all required documents relating to BMI and BEC debts to MTW such as:

- contracts verifying indebtedness,
- bank documents,
- all relevant correspondence (to and from BMI and BEC) related to the debts,
- the information concerning this matter upon the SURALEB requests (prompt reply),
- all any other documents related to this matter upon SURALEB request.

3.1.3. To give SURALEB possibility to question MTW employees to get their evidence, which at SURALEB discretion can be used in relation to collecting BMI and BEC debts including in court hearings.

3.1.4. Not to instruct any other organization, party or representative to take any action(s) which may harm SURALEB's activity or affect the result under this Agreement.

3.1.5. To inform SURALEB immediately about all changes which may occur in MTW relations with BMI and BEC, of the attempts to find some solutions in recovering the debt, of all contacts.

3.1.6. To agree that all assets (money and assets by value) recovered by SURALEB or with its assistance from BMI and BEC reducing their indebtedness to MTW will be transferred to MTW account or under its total control with the exception of SURALEB fee in amount and in order defined in paragraph 3.2.9. of the present Agreement.

3.1.7. To give SURALEB possibility to actively participate in revival and

возобновлении и развитии продаж продукции МТЗ в США и Канаде после перехода с помощью SURALEB под контроль МТЗ товарного знака "BELARUS" и в целом бизнеса (инфраструктура, гудвил), на условиях отдельного Соглашения, предусматривающего взаимное сотрудничество сторон.

3.2. SURALEB обязуется:

3.2.1 Использовать переданные ему МТЗ права и полномочия по взысканию долга с BMI и BEC в интересах МТЗ , а также для возвращения товарного знака МТЗ "BELARUS" в США и Канаде под полный контроль МТЗ, при этом предпринимать любые необходимые действия для этого, в том числе и в судебном порядке в интересах МТЗ, в отношении BMI BEC и их руководителей, а также в отношении любых других юридических и физических лиц, причастных к долгам BMI и BEC перед МТЗ, при этом прилагать все усилия для выполнения своих обязательств по этому соглашению на самом высоком уровне.

3.2.2. Обратиться с заявлением в Федеральный суд по банкротству в г.Милуоки, Висконсин, США не позднее 5 (пяти) дней с даты подписания настоящего соглашения, для представления интересов МТЗ, включая, но не ограничиваясь, подачу прошения о полном банкротстве (ликвидации) BMI с требованием незамедлительного ареста (блокирования) всех без исключения активов BMI.

3.2.3. Войти в контакт с Поверенным МТЗ в Канаде компанией "Equipment Consultants, a Division of Tri Sun Ventures Inc. с целью забрать у нее дело, которое она безуспешно более 1,5 года ведет против BEC в Канаде на условиях соглашения с МТЗ.

3.2.4. Обратиться с заявлением в Суд г.Торонто, Онтарио, Канада, не позднее 10 дней с даты подписания настоящего Соглашения, для представления интересов МТЗ с подачей прошения о

development of sales of MTW products in the USA and in Canada when MTW gets with SURALEB assistance full control of "Belarus" trade mark and business as a whole (infrastructure, goodwill) on the basis of a separate Agreement allowing for mutually beneficial co-operation of the parties.

3.2 SURALEB undertakes:

3.2.1. To use the rights transferred to it by MTW and authority to collect the debts in the interests of MTW as well as for giving back "Belarus" trade mark in the USA and in Canada under total MTW control; to undertake any actions necessary for it, including in court, in the MTW interests against BMI BEC and their management as well as against any other juridical and physical persons responsible for BMI and BEC debts to MTW; to make all the efforts for further fulfillment of its obligations under this Agreement at the highest possible level.

3.2.2. To apply to the Federal bankruptcy court in Milwaukee , Wisconsin, the USA no later than 5 (five) days since the date of signing of the present Agreement to represent MTW interests including but not limited to issuing an application for total bankruptcy (liquidation) of BMI with a request to immediately arrest (block) all without exception assets of BMI.

3.2.3. To contact MTW attorney in Canada the company Equipment Consultants a Division of Tri Sun Ventures Inc. in order to collect from it the case which it unsuccessfully during more than 1.5 years carries against BEC in Canada under the Agreement with MTW.

3.2.4. To apply to the court in Toronto, Ontario, Canada no later than 10 days since the date of signing the present Agreement to represent MTW interests with filing a petition for total bankruptcy

полном банкротстве (ликвидации) ВЕС, с требованием немедленного ареста (блокирования) всех без исключения активов ВЕС, а также с требованием пересмотра решения суда в г.Торонто от 7 февраля 2000г. , о рассмотрении на заседании суда, назначенного на 25 апреля 2000 года предложения адвокатов ВЕС о снятии требования МТЗ о банкротстве ВЕС в пользу мирного урегулирования между ВЕС и МТЗ.

3.2.5. Нести ответственность по защите интересов МТЗ и оплачивать расходы, связанные с любыми исками, которые ВМI и ВЕС, или их представители, действующие от их имени, могут выставить или начать против МТЗ

3.2.6. Соблюдать полную конфиденциальность в отношении ведущегося SURALEB дела против ВМI и ВЕС по данному Соглашению.

3.2.7. Осуществлять действия, не противоречащие законодательству Республики Беларусь, США и Канады, а также других стран, если работа по данному соглашению ведется на их территории.

3.2.8. Предоставлять отчеты, касающиеся выполнения данного Соглашения, с периодичностью не реже одного раза в месяц;

3.2.9. Передать под абсолютный контроль МТЗ все активы ВМI и ВЕС, взысканные SURALEB в результате деятельности по возвращению долгов ВМI и ВЕС в пользу МТЗ.

При этом от всех взысканных денежных средств SURALEB в качестве гонорара получает суммы согласно следующему расчету:

• 50% от суммы до 3 (трех) миллионов долларов США,
• 20% от всех сумм свыше 3 миллионов долларов до 14 (четырнадцати) миллионов долларов США,
• 12% от всех сумм свыше 14 миллионов долларов США.

(liquidation) of BEC with a request to immediate arrest (blocking) of all without exception BEC assets as well as with a request to reconsider court order in the city of Toronto dated 02.07.2000 about evaluating at court hearing scheduled for the 25 of April 2000 suggestion form BEC lawyers to cancel MTW demand for BEC bankruptcy for the benefit of settlement between BEC and MTW.

3.2.5. To be responsible for defending MTW interests and to expenses related to any actions which BMI and BEC or representatives acting on their behalf can put forward or commence against MTW

3.2.6. To adhere to strict confidentiality in relation to the action against BMI and BEC conducted by SURALEB under this Agreement.

3.2.7. To undertake actions not repugnant to the legislation of the Republic of Belarus, the USA and Canada as well as other countries , if work under this Agreement is conducted on their territory.

3.2.8. To present reports related to fulfillment of the present Agreement no less than once a month.

3.2.9. To transmit under absolute control of MTW all assets of BMI and BEC levied by SURALEB as a result of activity on returning of the debts of BMI and BEC for the benefit of MTW

At the same time from all the levied amounts SURALEB as a fee receives the amounts according to the following calculation:

• 50% from the amount up to 3 (three) million US dollars,
• 20% from all amounts in access of 3 million up to 14 (fourteen) million US dollars
• 12% from all the amounts in access of 14 million US dollars

3.2.10. Если в связи с деятельностью SURALEB по возвращению задолженности с ВМІ и ВЕС эти общества переходят под полный контроль МТЗ, вместе с их инфраструктурой и товарным знаком "Belarus" не позднее 3 квартала 2000, общий гонорар по разделу 3.2.9, составит 30% от всей взысканной суммы.

3.2.10. If in relation to SURALEB activity to collect BMI and BEC debt these companies are vested under total MTW control together with all the infrastructure and "Belarus" trade mark no later than the third quarter of the year 2000 SURALEB fee under the paragraph 3.2.9 will constitute 30% of total amount recovered by it.

#### 4. Прочие условия

4.1 При необходимости, для успешного выполнения поручения по настоящему Соглашению SURALEB уполномочивается привлекать для оказания содействия специалистов (адвокатов, юристов и т.д.) после предварительного согласования с МТЗ. Расходы по оплате услуг привлекаемых специалистов несет SURALEB.

4.2. Любые взыскания SURALEB натурой в связи с долгом ВМІ и ВЕС будут оценены сторонами по договоренности на базе таких документов, как инвентаризационная ведомость складов товаров ВМІ и ВЕС, , оценка рыночной стоимости недвижимости и земли, принадлежащей ВМІ и ВЕС на конкретную дату, банковских справок о состоянии счетов ВМІ и ВЕС и т.п. Если стороны не смогут прийти к согласию относительно стоимости взысканной натуры, такая оценка будет решаться в соответствии с судебными процедурами как указано ниже.

4.3. В случае банкротства ВМІ и ВЕС оплата услуг ликвидационной комиссии будет производиться в установленном законодательством порядке.

#### 4. Other conditions

4.1. If necessary for the successful execution of the task under this Agreement SURALEB is authorized to employ the services of specialists (solicitors, lawyers, etc.) after prior confirmation from MTW. The costs of such services will be for the account of SURALEB.

4.2. All recovery by SURALEB in kind related to BMI and BEC debt will be valued by the parties via negotiations on the basis of such documents as inventory listing of BMI and BEC goods in storage, evaluation of cost of estate and land belonging to BMI and BEC for a specific date, bank references about BMI and BEC accounts and so on. If parties can not reach agreement as to the cost of goods recovered in kind such valuation will be done in accordance with the legal proceedings as specified below.

4.3. In case of BMI and BEC bankruptcy payment for services of the liquidation commission is to be made in accordance with the procedure prescribed by the legislation.

## 5. Порядок изменения и расторжения Соглашения

5.1. Соглашение может быть изменено или расторгнуто только по взаимной договоренности сторон.

## 6. Рассмотрение споров

6.1. Все разногласия по данному Соглашению должны решаться путем переговоров сторон. Если же стороны не придут к согласию, то все споры должны разрешаться арбитражем, состоящим из трех арбитров в соответствии с правилами Комиссии ООН по Международному Торговому Праву (UNCITRAL). Местом рассмотрения споров будет являться Стокгольм, Швеция и все назначения будут производится Торговой Палатой Швеции. Данное Соглашение должно интерпретироваться в соответствии с правом штата Висконсин, США.

Лица, подписавшиеся ниже заявляют, что они имеют все полномочия сделать данное соглашение обязательным к исполнению сторонами, от имени которых они его подписывают.

Настоящее Соглашение составлено в двух экземплярах на русском и английском языках, по одному для каждой из Сторон, причем оба текста имеют одинаковую юридическую силу.

## Юридические адреса сторон:

**МТЗ**: 220009, ул.Долгобродская,29 Минск, Республика Беларусь Асс.3012000673001 в Белвнешэконом банк, Минск, Республика Беларусь; SWIFT: BELB BY 2X through BANK OF NEW YORK Асс. 890-0057-025 SWIFT: IRVTUS 3N

**SURALEB** 313 Бассвуд проезд, Наперввилл, Ил. 60540, Банк один, Напер Бульвар, Наперввилл, Иллинойс 60540 Асс. #1110019025652

Дата   29.04.т...

## 5. Agreement Amendment and cancellation

5.1. The Agreement can be amended or canceled by mutual consent.

## 6. Disputes

6.1. All disputes under this Agreement shall be resolved by way of negotiations between the parties. If the parties do not agree, all the disputes shall be resolved by arbitration by a panel of three arbitrators under the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL). The site of the arbitration shall be Stockholm, Sweden. All appointments shall be by the Chamber of Commerce of Sweden. This agreement shall be interpreted in accordance with the laws of the State of Wisconsin, USA.

Persons that signed below state that they have all the authority to make this Agreement binding for execution by the Parties on behalf of which they sign it.

The present Agreement is made in two copies in English and in Russian, one for each Party, both texts have the same legal effect.

## Legal addresses of the parties:

MTW 220009 Dolgobrodskaya St., 29 Minsk, Republic of Belarus Acc.3012000673001 in Belvneshconombank, Minsk, Republic of Belarus; SWIFT: BELB BY 2X through BANK OF NEW YORK Acc. 890-0057-025 SWIFT: IRVTUS 3N

SURALEB 313 Basswood dr. Naperville, Il 60540, Bank One Naper Blvd. Naperville, Illinois 60540 Acc. #1110019025652

DATE
04/28/00

# EXHIBIT B

**FINAL AWARD**

**RENDERED IN STOCKHOLM ON 31 MAY 2006**

**IN AN ARBITRATION**

**under the**

**UNCITRAL**

**Rules of Arbitration**

**BETWEEN:**

**SURALEB, INC.**

**Claimant**

**and**

**PRODUCTION ASSOCIATION "MINSK TRACTOR WORKS"**

**Respondent**

**Arbitral Tribunal**

Per Runeland, Chairman

Bo G.H. Nilsson, Arbitrator

Rolf Olofsson, Arbitrator

## CONTENTS

| | | |
|---|---|---|
| 1 | BACKGROUND, ARBITRATION CLAUSE, GOVERNING LAW AND PROCEEDINGS | 3 |
| 2 | RELIEF SOUGHT | 6 |
| 3 | LEGAL GROUNDS RELIED ON BY THE PARTIES | 10 |
| 4 | LEGAL AND FACTUAL CIRCUMSTANCES INVOKED BY THE PARTIES | 12 |
| 5 | REASONS FOR THE AWARD | 23 |
| 6 | COSTS | 37 |
| 7 | AWARD | 38 |

Arbitral Award rendered in Stockholm, Sweden in an arbitration between:

*CLAIMANT:*

*SURALEB, INC.,* an Illinois corporation with its principal place of business at 1121 Candlewick Drive, Poplar Grove, Illinois, 61065 USA, hereinafter referred to as "Suraleb".

*REPRESENTED BY:* J Samuel Tenenbaum and Barry Rosen of the law firm of Sachnoff & Weaver, 30S Wacker Drive, Chicago, Illinois, 60606, and Norman L Hafron of the law firm of Rosenfeld, Rotenberg, Hafron & Shapiro, 221 North LaSalle Street, Chicago, Illinois, 60601

and

*RESPONDENT:*

*PRODUCTION ASSOCIATION "MINSK TRACTOR WORKS",* 29 Dolgobrodskaya Street, Minsk, Republic of Belarus, 220668, hereinafter referred to as "MTW".

*REPRESENTED BY:* David A Baron and William D. Hagedorn of McDermott Will & Emery, Washington, DC, Christer Holm, Stockholm, and Erik Linnarsson of Advokatfirman Lindahl, Stockholm

## 1   BACKGROUND, ARBITRATION CLAUSE, GOVERNING LAW AND PROCEEDINGS

### 1.1   General Background

Suraleb is an Illinois corporation which under an agreement number 213/-06/10 entered into by it and MTW on 28 April 2000 (the "Agreement") has agreed to co-operate with MTW in collecting debts owing to MTW by Belarus Machinery, Inc. ("BMI") in Milwaukee, Wisconsin, USA and Belarus Equipment of Canada Limited ("BEC").

Under the Agreement MTW authorised Suraleb to represent MTW's interest in collecting for its benefit the debts which had arisen when BMI and BEC purchased products from MTW, and which remained unpaid. The Agreement contained a number of specific undertakings by MTW and Suraleb in relation to the manner in which the collection of debts would be carried out. A key provision of the Agreement related to Suraleb's undertaking to transfer collected assets to MTW in return for a fee. This essential clause 3.2.9 is quoted here:

> "3.2.9    To transmit under absolute control of MTW all assets of BMI and BEC levied by Suraleb as a result of activity on returning of the debts of BMI and BEC for the benefit of MTW.
> At the same time from all the levied amounts Suraleb as a fee receives the amounts according to the following calculation:

- 50% from the amount up to 3 (three) million US dollars,
- 20% from all amounts in access of 3 million up to 14 (fourteen) million US dollars
- 12% from all the amounts in access of 14 million US dollars"

This clause has been quoted from the English text of the Agreement. The Agreement was in fact executed in both English and Russian with both texts to have the same legal effect. It is the English language version that has been relied on by both parties in this arbitration.

At an early stage of this arbitration, Suraleb also relied on a second agreement dated 12 March 2002 and referring to an exclusive distributorship granted by MTW to Suraleb in the USA and Canada. That agreement contained a different arbitration clause and the parties have indicated that they concur that any claims under it fall outside this arbitration.

1.2     The Agreement to Arbitrate

Clause 6 of the Agreement provides for the resolution of disputes by arbitration. It reads as follows:

> "6.     Disputes
>
> 6.1     All disputes under this Agreement shall be resolved by way of negotiations between the parties. If the parties do not agree, all the disputes shall be resolved by arbitration by a panel of three arbitrators under the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL). The site of the arbitration shall be Stockholm, Sweden. All appointments shall be by the Chamber of Commerce of Sweden. This agreement shall be interpreted in accordance with the laws of the State of Wisconsin, USA."

1.3     Governing Law

The arbitration clause stipulates that the Agreement shall be interpreted in accordance with the laws of the State of Wisconsin, USA. The parties have been in agreement that the laws of Wisconsin govern this contractual relationship.

1.4     The Proceedings

In an undated request for arbitration received by the Arbitration Institute of the Stockholm Chamber of Commerce on 12 December 2003, Suraleb initiated this arbitration and introduced a preliminary statement of the relief sought, which has been amended in the course of the arbitration. The final claim is set out below.

Suraleb's request for arbitration had been preceded by a demand for arbitration sent in August 2003 by fax and by registered mail to four persons at MTW including Mr A.A. Puchovoy, its director general.

Following the receipt of the request for arbitration on 12 December 2003, the Arbitration Institute of the Stockholm Chamber of Commerce (the "Institute") was in correspondence with Suraleb regarding the manner of the appointment of arbitrators etc. On 9 January 2004, Suraleb sent an e-mail to the Institute confirming that the UNCITRAL Arbitration Rules (the "Rules") should apply and that "the Stockholm Chamber of Commerce (SCC Institute)" should be the appointing authority. Following correspondence with MTW, the Institute appointed Per Runeland as chairman of the Arbitral Tribunal and Bo G.H. Nilsson and Rolf Olofsson as arbitrators and so informed the parties and the members of the Arbitral Tribunal. The Arbitral Tribunal started its correspondence with the parties on 16 February 2004, asking Suraleb to submit its Statement of Claim with reference to Article 18 of the Rules, to be followed by the Respondent's Statement of Defence, requesting the parties to pay specified advances on cost and taking certain further action. After Suraleb had paid its share of the initial advance and submitted a Statement of Claim dated 9 March 2004, and MTW did not make any payment towards the required advance and did not submit any Statement of Defence, the Arbitral Tribunal issued its first formal procedural order on 28 April 2004. A great number of further Procedural Orders were issued to the parties during 2004 and 2005, with a final 21st Procedural Order issued on 30 December 2005.

The Procedural Orders have dealt with a large number of procedural issues, including interim relief, and disclosure of documents and information, and ruled on several objections and requests put forward by either party. One of the early rulings concerned the manner in which the Arbitral Tribunal was appointed. In the course of the proceedings, MTW has filed objections, in particular against the jurisdiction of this Arbitral Tribunal, and the manner in which this arbitration was commenced by Suraleb. When certain of MTW's jurisdictional and procedural objections and requests were unsuccessful, MTW continued its participation in the arbitration while reserving its rights.

A preliminary hearing was held in Stockholm on 23 September 2005. A main hearing was held in Stockholm between 17 and 20 December 2005.

In the course of this arbitration, the parties have submitted and relied on extensive written and oral evidence relating to factual circumstances as well as the laws of Wisconsin.

During the final hearing evidence has been given by the following persons:

*At the request of Suraleb:*

Mr Richard Schuelke, President of Suraleb

Mr Bruce Horsley, Chartered Accountant

*At the request of MTW:*

Mr Leonid Skripko, Assistant to Director General of MTW

Mrs Elena Zhukova, Head of MTW's Legal Department

Mr Allen Pfeiffer, Duff & Phelps LLC, by video conferencing pursuant to the agreement of the parties.

1.5     Statements of Evidence

In advance of the final hearing, the parties had submitted statements indicating the intended scope of each testimony and the subject of the written and oral evidence relied on.

1.6     Advances on Costs

The parties have provided advances on costs at the request of the Tribunal. Through a series of payments Suraleb has paid in (net after repayment) SEK1,220,685 and MTW SEK1,199,880.

**2       RELIEF SOUGHT**

2.1     Relief sought by Suraleb.

2.2     As finally determined by Suraleb, the relief it seeks has been stated as follows.

| | |
|---|---|
| Value of Assets Recovered in the BMI proceeding. | USD13,851,000 |
| Value of Assets Recovered in the BEC proceeding. | USD6,097,403 |
| **Total** | **USD19,948,403** |
| Fee Due to Suraleb Per 3.2.9 of the Agreement dated 04/28/2000[1]. | USD4,413,808 |
| **Amount of requested award.** | **USD4,413,808** |

---

[1] Suraleb submits: The Agreement specifies that the fee to be paid to Suraleb is 50% of the first $3 million collected, 20% of the next $11 million, and 12% thereafter (in this instance, the remaining $5.9 million collected). All amounts are in U.S. dollars.

| Amount to be subtracted from any award to Suraleb based upon partial distribution.[2] | USD585,000 |
| --- | --- |

For the purpose of clarity, Suraleb requests that the award entered by this panel reflect:

(a)    the total amount of the fee earned (USD4,413,808);

(b)    the credit due to MTW (USD585,000) for amounts already paid; and

(c)    the amount of interest due, as well as attorneys' fees and costs as appropriate.

Suraleb's claim for interest is as follows:

Pre-award interest is claimed at the rate of 5% p.a. from 13 February 2003. Post-award interest is not sought from this Arbitral Tribunal but Suraleb has requested that the award recognise Suraleb's right to seek post-award interest at the enforcement stage.

Suraleb also claims its costs of arbitration including legal representation.

2.3    Relief Sought by MTW

As finally determined by MTW, the relief sought by MTW is as follows.

2.4    <u>By its Counterclaim</u>, MTW asks the Tribunal to order Suraleb

(a)    to perform the 2000 Agreement by transferring "total" and "absolute" control to MTW of all of the collected trade marks and domain names as well as all other collected assets in Suraleb's control and

(b)    to pay MTW compensatory damages plus interest calculated as follows:

        (i)    the fair market value of the collected assets at the dates of collection:

                -    USD3,795,355 worth of US assets as at 11 April 2002, and

                -    CAD5,983,525 worth of Canadian assets as at 5 September 2002;

        (ii)   plus interest on the above principal amounts with 5% per annum from the dates of collection and until the date of transfer of the assets under MTW's control;

        (iii)  less the fair market value of those same assets at 1 October 2005[3];

---

[2] Suraleb submits: Suraleb received partial payments on April 15, 2002 ($310,000) and November 12, 2002 ($275,000). Statutory interest under Wisconsin law should be calculated at 5% of $3,828,808 (the full amount due of $4,413,808 less the $585,000 received) from the 13 February 2003 date of the demand through the date of this Panel's award

- USD(-)negative 1,112,262 worth of US assets; and

- CAD4,744,335 worth of Canadian assets,

(iv)     plus the fair market value of collected assets that are not transferred to MTW at the date those missing assets would otherwise have been transferred;

(v)      plus interest on the net amount of (i) + (ii) + (iv) with 5% per annum from the date of transfer of the assets and until full payment is made.

(c)     to pay MTW punitive damages in an amount corresponding to three times the compensatory damages awarded by the Tribunal.

2.5     MTW's Position to Suraleb's Claim

By its Defence, MTW asks the Tribunal (the following is quoted from MTW's submission, with small editorial changes):

(a)     to deny all of Suraleb's Claims (i.e. monetary award for the fee earned and pre-award interest thereon), and

(b)     to subtract from any Claim awarded to Suraleb (set-off)

(i)      an amount of USD638,894.43 (which Suraleb already admitted that it paid itself and its attorneys out of MTW's assets), as well as

(ii)     any other amount that Suraleb has already paid itself or its attorneys, namely

- CAD839,078 paid to Simpson Wigle (Canadian lawyers);

- USD370,500 in "management fees" and "bonuses" that Suraleb has paid itself (fees of USD 4,500 per month from April and September 2002 for the U.S and Canadian entities, respectively, and until 31 December 2005 plus bonus of USD 15,000;

- USD160,598 in disbursements received by Mark Katsnelson, Alex Katsnelson and Richard Shuelke, in 2002 alone;

---

[9] MTW submits: It is for Suraleb to prove that the assets that it transfers to MTW are all of the collected assets. For *practical reasons*, however, MTW accepts that all tractors and parts and the real estate that are transferred to MTW shall be considered to be among the collected assets.

- USD2.68 million in cash that has disappeared from the bank accounts of BMI and an account held by Suraleb in the name of "Suraleb Inc. as Agent for MTW" for which Suraleb has not accounted and which hence should be subtracted from any claim awarded to Suraleb; and

- USD 480,000 that Suraleb forfeited by exchanging real property on unfavourable terms and hence should be subtracted from any claim awarded to Suraleb

MTW reserves the right to amend the amount to be subtracted under 2.2 b) ii) should further proof show that Suraleb has paid itself out of MTW's assets. This reservation is made due to the fact that only on 29 September 2005 did Suraleb admit in these proceedings that it had paid itself out of the collected assts and quantified that amount to USD585,000 notwithstanding the fact that Suraleb as late as 26 April 2005 stated that "MTW owes Suraleb USD4,413,808 for services rendered by Suraleb to MTW, none of which has been paid" (Suraleb's own underlining). Also, at the preliminary hearing, Suraleb admitted that some of Suraleb's people have been paid from the collected assets. Suraleb has not specified this further. MTW has had very limited time to review books and records and has been denied access to documents which relate to distributions of collected assets made to pay Suraleb.

As for Suraleb's calculation of the principal amount of USD4,413,308 and the interest claimed, MTW's position is the following.

MTW admits that the formula in the Agreement provides that the principal amount (fee) to be paid to Suraleb is

- 50% from the collected amount up to USD3 million;

- 20% from collected amount in excess of USD3 million up to USD14 million and

- 12% from all collected amount in excess of USD14 million.

Consequently, should the Tribunal determine that the applicable value of the assets collected by Suraleb is USD19,948,403, MTW admits that Suraleb's fee "as such" under the 2000 Agreement would amount to USD4,413,308 as Suraleb claims.

MTW denies that Suraleb is entitled to pre-award interest because the obligation to pay the fee falls due on the date of the award. Should the Tribunal determine that Suraleb is entitled to whole or part of the claimed principal amount and that such amount became due on 13 February 2003, MTW admits "as such" pre-award interest with 5% per annum on said amount as per 13 February 2003 up to and including the date of the award.

2.6     The costs of the Arbitration

MTW's claims that the Tribunal award MTW compensation from Suraleb for MTW's costs (including attorneys' fees) in the arbitration, including interest thereon, and order Suraleb - as between the parties - to pay and bear all of the costs of the arbitration.

3       **LEGAL GROUNDS RELIED ON BY THE PARTIES**

3.1     Legal Grounds adduced by Suraleb

The basic argument in support of Suraleb's claim is that MTW is in breach of the Agreement and the Arbitral Tribunal should enforce Suraleb's rights under it. Although Suraleb has at times qualified its claim as one for damages, its consistent argument has been that it is owed a fee which must be awarded under the terms of the Agreement.

Suraleb's claim for pre-award interest is based on Wisconsin law.

3.2     Legal Grounds adduced by MTW

MTW's defence and counterclaim are based on the Agreement and on Wisconsin law on agents and attorneys and their fiduciary duties.

Although Suraleb has collected certain assets, no fee has yet fallen due because the value of the assets which determines the fee has not yet been established in accordance with Section 4.2 of the Agreement.

Because of deficient reporting by Suraleb, no relevant date for valuation of the assets has been available until late in this Arbitration and MTW accepts 1 October 2005 as the relevant date for valuation.

Suraleb earns a fee established on the basis of the fair market value of the collected assets.

However, because of numerous breaches of contract by Suraleb, it is not entitled to any fee.

MTW's Counterclaim is supported by the following legal grounds.

MTW has a claim for performance of the Agreement, Section 3.2.9 of which stipulates that Suraleb must submit under the absolute control of MTW all assets of BMI and BEC collected by Suraleb. Performance by Suraleb is still outstanding.

MTW is entitled to damages from Suraleb based on Suraleb's breach of its fiduciary duties existing under an agency relationship created by the Agreement and subsequent written powers of attorney.

Suraleb has not fulfilled specific fiduciary obligations including:

- the duty of loyalty requiring Suraleb to act only for MTW's benefit;

- the duty of care with respect to the collected assets, which includes a duty to keep and render accounts of assets collected, a duty to not confuse or appear to own principal's things, the duty of reasonable care in collecting the assets, keeping the assets safely and in delivering the assets to MTW, and the duty to make full disclosure to MTW

Suraleb's fiduciary obligations with respect to the collected assets remain until they are transmitted to MTW and are unaffected by any breach by MTW or the termination of the agency.

Suraleb as agent bears the burden of proving whether it has complied with its fiduciary obligations, and Suraleb has not proved that it complied with its fiduciary duties.

In fact, Suraleb has breached its fiduciary duties owed to MTW, and as an agent in breach of its fiduciary duties, Suraleb is also liable in tort for punitive damages.

Suraleb is liable for conversion under Wisconsin law due to its failure to account for assets, the conversion of property such as tractors without express authorisation and by conversion of the Canadian assets; breaches of this type create liability in tort for punitive damages.

Suraleb materially breached the Agreement by its breaches of fiduciary duties and by paying itself cash from the assets collected without "at the same time" transmitting to MTW all assets collected, and further by refusing to negotiate the value of assets collected in kind and by Suraleb's failure to provide monthly reports and by its failure to file an application for conversion of BMI's Chapter 11 case.

In summary, since Suraleb violated the fiduciary duties owed to MTW, materially breached the Agreement, and is liable for conversion, MTW is entitled to compensatory damages. The breaches relied on by MTW, together and each separately, entitle MTW to compensatory damages.

Based on breach of fiduciary liability, Suraleb is also liable under Wisconsin law for punitive damages of three times the compensatory damages.

MTW's claims for interest are based on Wisconsin law.

It is common ground between the parties that any fee to which Suraleb is entitled should be offset by amounts Suraleb has already paid itself.

4       **LEGAL AND FACTUAL CIRCUMSTANCES INVOKED BY THE PARTIES**

*Suraleb*

4.1     Over a number of years, MTW sold tractors to BMI and BEC.  MTW owned 10% of the shares of BMI.  The other 90% belonged to "Avtotractorexport", a Russian legal entity ("ATEX"), which also owned 100% of the shares of BEC.

4.2     Over a ten-year period, MTW sold and shipped tractors and parts to BEC and BMI without being paid.  As a result, as of November 1999, before Suraleb was retained to collect the debt, BMI owed MTW USD28,489,270 for goods it had received from MTW, and BEC owed MTW CAD9,538,439 and USD2,974,542 for goods received from MTW.  MTW had undertaken numerous efforts, including those made through ATEX, over a lengthy period of time to collect the receivables from BMI and BEC.  On 17 August 1998, prior to retaining Suraleb to collect the debt, MTW commenced bankruptcy proceedings against BEC in Toronto, Ontario, Canada.  In response to MTW's action, BEC asserted a multi-million dollar cross action against MTW challenging the quality of products it received from MTW.  In addition, among other things, BEC moved to dismiss MTW's bankruptcy petition in light of a settlement that MTW had entered into with BEC regarding its claim.  MTW contested that the settlement was final, and there were conflicting versions of events on this point.

4.3     As a result, despite 1.5 years of legal proceedings, prior to retaining Suraleb to collect the debt, MTW had not received any offer which could be acceptable to it with respect to the collection of the BMI and BEC debts and MTW had acknowledged that MTW was without a clear prospect of a quick and positive conclusion.

4.4     In the US, at a time pre-dating the Agreement, BMI filed for Chapter 11 bankruptcy protection in the United States District Court in Milwaukee, Wisconsin.  BMI also challenged the quality of MTW's products supplied and denied that it owed the amount claimed by MTW.  It also claimed an

exclusive right to sell MTW products in the US and asserted it had millions of dollars in claims against MTW.

4.5     In the BMI bankruptcy proceeding, the Bankruptcy Court voiced considerable concern with respect to the validity of MTW's debt given the fact that MTW had a representative on the Board of Directors of BMI throughout the entire time period and had, over a ten-year period, not sought any repayment on its debts.

4.6     The Agreement itself provides that BMI and BEC, respectively, owe MTW the sums stated above. The Agreement provides that MTW had undertaken numerous efforts to collect the BMI and BEC debts over a lengthy period of time and legal proceedings had been commenced by MTW against BEC in Toronto, Ontario, Canada, and MTW intended to start legal proceedings against BMI. In view of the foregoing, and other stated circumstances, MTW had intended to cancel relations with the company that was at present protecting MTW interests in Canada.

4.7     MTW initiated the retention of Suraleb and during negotiations set forth its goals, which included:

- capture trademark and ongoing business

- do not shut down and liquidate business

- make sure in Chapter 11 insolvency proceedings, the business did not shut down

- pay all claims from dealers and make sure suppliers were paid

- capture an ongoing entity in US and Canada to allow continuation/resurrection of business.

4.8     These goals were reflected in the Agreement.

4.9     Pursuant to the Agreement, MTW undertook "To transfer to SURALEB all its rights for collecting BMI and BEC debts in the interests of MTW and returning MTW's trademark 'Belarus' in the USA and Canada under total MTW control."

4.10    Suraleb was to be paid for its efforts on the basis of a percentage of assets collected. The formula set out in the Agreement has been reproduced above.

4.11    Additionally, Suraleb and MTW agreed that Suraleb would act as MTW's exclusive sales agent in the United States with respect to the sale of Belarus tractors made by MTW in anticipation of the continuing operations of BMI and BEC after conclusion of successful legal proceedings by Suraleb.

4.12    Suraleb retained as its counsel Sachnoff & Weaver, Ltd and Rosenfeld, Rotenberg, Hafron & Shapiro.

4.13    Suraleb has performed and completed all of its obligations under the Agreement in the United States and Canada.  The US and Canadian litigations required not only the assertion of MTW's claims, but also the defence in settlement of numerous related claims with creditors, banks, the United States Internal Revenue Service, dealers, other governmental units and personal injury claims including several death claims.

4.14    Suraleb fulfilled its duties and at the end of the process of recovery, which included a number of practical and legal and administrative measures, including bankruptcy proceedings involving BMI and BEC, Suraleb obtained for MTW a range of assets in the United States and Canada.

4.15    In the United States, Suraleb obtained for the benefit of MTW, through an asset purchase agreement signed by an employee and authorised representative of MTW, after approval of a plan of reorganisation by the Court, which had received no objections from interested parties, including MTW, which received notice of the plan, the following assets:

- every asset of debtor including receivables, inventory, real property, intangibles, trademarks, website

- assets listed in Exhibits A and B to the Bill of Sale

- all assets were obtained free and clear of all liens and debt

- Suraleb limited a USD3,000,000 Internal Revenue Service claim to USD750,000 and

- surplus cash after creditors were paid

- the dealer network was maintained without paying claims.

4.16    In Canada Suraleb obtained trademark, ongoing business, dealer network, real estate, inventory, cash and receivables for the benefit of MTW.

4.17    Throughout the recovery proceedings, Suraleb kept MTW advised of developments.  This was done orally and in writing.  There were meetings in Canada, the United States and Belarus.

4.18    MTW has refused to pay Suraleb for its efforts, although MTW retained Baker & McKenzie to conduct a review of Suraleb's activity, which found that Suraleb and its lawyers had conducted themselves properly.

4.19    Suraleb performed all of its obligations under the Agreement, resolved the BMI and BEC debts completely, recovered all available BMI and BEC assets for the benefit of MTW and restarted MTW's marketing and sales efforts in the United States and Canada.  Nonetheless, MTW did not perform its obligations under the Agreement.

4.20    MTW's non-performance was not limited to the non-payment of the commission due.  There was also a failure to fully cooperate and provide accurate information.  MTW refused to provide a power of attorney in the form requested by Suraleb and required by the Agreement.  MTW had an early opportunity to resolve matters but refused, necessitating several years of additional litigation and expense by Suraleb.  MTW propounded inconsistent positions and attempted to make side deals with others.  It attempted to interfere with the dealer network, which Suraleb was maintaining, by attempting to persuade various dealers to work with a Bulgarian company involved in selling MTW tractors in the United States.

4.21    MTW was thus responsible for delays until, on 12 April 2003, MTW advised Suraleb that it would not make any payment to Suraleb for the work it had completed until the assets were actually transferred to MTW.  MTW added additional obligations such as requiring Hague Convention stamps on all documents, even those previously known to MTW.  Suraleb had to advance tax payments to the Internal Revenue Service.  MTW continued to violate the terms of the Agreement, which allowed Suraleb to withhold the transfer of assets until it had received payment, by demanding that the trademarks be transferred to MTW despite MTW's having paid Suraleb nothing for its completed efforts.  Suraleb had registered the trademarks in its name as agent for MTW in order to assure that prior to its transfer it received its payment under the terms of the Agreement.  MTW demanded that the trademarks be transferred to it first and then it would discuss payment.  This contravened the Agreement.

4.22    In spite of the other disagreements between the parties, MTW made certain admissions in respect of the tasks completed by Suraleb.

4.23    On 13 February 2003, having completed its obligations, Suraleb presented MTW with its bill for USD4,413,808 (the "Bill").  The fairness of the Bill is supported by MTW admissions, independent auditor financial statements, independent court-appointed trustees' financial statements, and sworn reports.  Suraleb relies on the Agreement which, in its clause 4.2, stipulates as follows: "All recovery by Suraleb in kind related to BMI and BEC debt will be valued by the parties via

negotiations on the basis of such documents as inventory listing of BMI and BEC goods in storage, evaluation of cost of estate and land belonging to BMI and BEC for a specific date, bank references about BMI and BEC accounts and so on. If parties can not reach agreement as to the cost of goods recovered in kind such valuation will be done in accordance with the legal proceedings as specified below."

4.24    The value of the assets relied on by Suraleb is as of the time Suraleb obtained the assets. Historical financial statements were relied on in support. Further, Suraleb has had Bruce Horsley, a chartered accountant and a specialist in investigative and forensic accounting, review the fairness of the Bill against the background of underlying fair market values. Furthermore, MTW had itself inspected the assets during a visit in 2001.

4.25    The Bill was based on an amount recovered in the United States of USD13,851,000, made up as follows:

- cash of USD675,000 held by Sachnoff @ Weaver

- accounts receivable USD368,000

- real estate USD1,107,000

- inventory USD6,864,000

- furniture and equipment USD71,000

- IKAR USD1,466,000 (an investment)

- goodwill USD1,300,000

- trade marks USD2,000,000

4.26    Further, the Bill was based on an amount recovered in Canada of CAD9,572,923, converted to US dollars as USD8,097,403.

4.27    The total recovery is therefore USD19,948,403, as stated in the Bill.   The application of the remuneration formula set out in the Agreement results in a fee for Suraleb of USD4,413,808.

4.28    Suraleb has initially relied heavily on values of the recovered assets determined through insolvency proceedings in the United States and Canada, but in submissions from September 2005 onwards and at the hearing, the focus has been on additional valuations by Mr Horsley as

confirmation of the reasonableness of the Independent Trustee values and of the amounts sought by Suraleb.

*MTW*

4.29    Suraleb's position is illogical because it requires MTW to value and identify assets which were not under MTW's, but under Suraleb's, control or possession. Suraleb was MTW's sole source of information but declined to provide MTW with a current and detailed accounting as required by the Agreement and Wisconsin law. Suraleb's position is not the position of a party acting in good faith.

4.30    Specifically, Suraleb did not fulfil its obligation under clause 3.2.8 of the Agreement "To present reports related to fulfilment of the present Agreement no less than once a month". Even during this arbitration Suraleb has not kept MTW informed of its fulfilment of the Agreement.

4.31    Moreover, under Wisconsin law Suraleb has an ongoing fiduciary obligation as MTW's agent and attorney-in-fact to provide a regular accounting of the assets in its possession.

4.32    Even after Suraleb provided further details, they and other Suraleb's activities in the arbitration have demonstrated that the Bill was substantially overstated and MTW was entirely justified in refusing to pay it. After submitting the Bill, Suraleb materially breached the Agreement by repudiating its obligations under section 4.2 thereof and explicitly refusing to negotiate the value of the collected assets, the amount of its fee, or even admitting that the actual market value of the assets should determine the amount of this fee.

4.33    After MTW's objections that certain claims and arguments fell outside the scope of this arbitration because they were not based on the Agreement but on a separate distributorship agreement made in 2002, Suraleb has modified its case but has continued to use arguments that are outside the scope of the Agreement and accordingly outside the competence of this Tribunal. This has complicated and increased the time and expense required for preparing MTW's submissions. Generally, non-compliance by Suraleb with the rules laid down by the Tribunal should be taken into consideration when the Tribunal decides upon the costs in the arbitration.

4.34    MTW's defence has been prejudiced by Suraleb's incomplete disclosure of assets initially collected from the BMI bankruptcy and the Canadian enforcement proceeding and assets still in Suraleb's possession or control in 2005. Further, Suraleb has never provided an accounting for what happened to the relevant assets from the moment of collection to the present. Suraleb has

nevertheless proceeded, as best it could, to a valuation of the relevant assets but MTW's basic position is that Suraleb's claim must be dismissed as unsupportable on the basis of the evidence submitted by Suraleb. Moreover, the UNCITRAL Rules, International law, International arbitration practice, and Wisconsin law all support the application of an adverse inference against Suraleb, based upon its failure to submit sufficient evidence in support of its claims.

4.35    Suraleb has failed to produce the evidence required to be produced by the Agreement. MTW relies on Section 4.2, quoted above at paragraph 4.23.

4.36    Because section 4.2 of the Agreement refers to goods 'in storage' the logical conclusion is that the valuation must refer to some time period after the assets have been put in collection, and Suraleb was not free to use or self-deal with these assets because they were supposed to have been 'in storage'. Similarly, the real estate was likely intended to be valued as of a date following collection, which is in direct contravention to Suraleb's theory of the case.

4.37    Suraleb has also failed to produce complete bank statements relating to accounts held by Suraleb as agent for MTW. A minimum consequence of such failure and refusal is that an adverse inference is to be taken as to any such documents or evidence that Suraleb has not timely produced. In rebuttal of Suraleb's arguments, MTW has submitted that no party alleging a breach of contract by the counterparty can recover if it itself has materially breached the contract. Further, Suraleb has failed to demonstrate that MTW was obligated to pay Suraleb's Bill upon demand.

4.38    Suraleb has asserted that MTW has breached a duty of good faith and fair dealing implied in every contract under Wisconsin law, depriving Suraleb of the benefit of its bargain with MTW. On the contrary, Suraleb has either allowed the value of the collected assets to diminish or has taken deliberate actions to cause this diminution. In the course of the arbitration, Suraleb has abandoned a claim based on the diminution in value of the collected assets, but this issue remains a focus in the arbitration due to MTW's counterclaim. MTW's experts have determined that the collected assets have lost much of their value and that the reason for the diminution has nothing to do with the failure of the unrelated joint venture between the parties. MTW had refused to pay the Bill on demand in 2003 because Section 4.2 of the Agreement expressly requires that the parties negotiate the value of any assets recovered in kind and because MTW suspected that the recovered assets were actually worth far less than Suraleb claimed. This is demonstrated by the report of Allen Pfeiffer of Duff & Phelps (formerly Standard & Poor's). The lower current value is a

result of an exaggerated initial valuation from Suraleb and subsequent activity by Suraleb including skimming cash from the collected assets in the form of "management fees" and "management bonuses". Suraleb also forfeited real property value by swapping Wisconsin property for a cheaper property without disclosure to MTW or this Tribunal.

4.39    Contrary to Suraleb's allegations, MTW repeatedly stated its willingness to pay Suraleb the full amount to which it was actually entitled under the agreement. It is true that MTW refused to pay the full amount of the Bill. Instead, MTW took the position that value under the agreement meant fair market value and requested an asset list that would render a fair market valuation possible.

4.40    MTW does not dispute that, under Wisconsin law, contract damages need only be proved with reasonable certainty when the nature of the injury leaves the full extent of damages uncertain. However, what Suraleb claims, its fee under the agreement, is capable of determination, as it is based on the value of the assets collected and equal to a percentage thereof. Suraleb's argument that its calculation is "good enough" is wrong. Suraleb has failed to calculate its damages with reasonable certainty under the circumstances. More importantly, Suraleb's argument ignores that Suraleb has additional fiduciary duties to its principal, MTW.

4.41    On the question of pre-judgment interest, Suraleb's claim must fail, because Suraleb has substantially overstated its claims. This legal consequence is firmly established in Wisconsin law. Suraleb's overstatement of its claim is borne out by its own evidence. The Bill was based on a total value of USD19,948,403, and Bruce Horsley's statements conclude that the value of the assets collected by Suraleb as agent for MTW was only USD16,746,524. Thus, if correct, Horsley's statements prove that Suraleb has substantially overvalued the amount of its claim. Including the sum of USD585,000 which Suraleb has already claimed for itself, the difference between the Bill and the amount due according to Suraleb's evidence is USD969,235.

4.42    Allen Pfeiffer's valuation report shows that Suraleb collected assets with a fair market value of only USD7,600,700. Applying the formula, this demonstrates that Suraleb has overvalued its claim by at least an additional USD1.5 million. Allen Pfeiffer's report shows that Suraleb was only entitled to a fee of approximately USD2.4 million, nearly USD2 million less than its actual demand. MTW advances these objections without prejudice to its basic submission that Suraleb was not entitled to any fee under the agreement because of its gross breaches of its contractual and fiduciary obligations.

4.43    We now turn to MTW's submissions on the counterclaim.  Under the Agreement, Suraleb was obligated to do everything necessary to prosecute and collect MTW's claims against BMI in the bankruptcy case and, specifically, under section 3.2.2 of the Agreement within five days of the signing of the Agreement to apply for the total bankruptcy of BMI with a request to immediately arrest all assets of BMI without exception.  The term "application for total bankruptcy (liquidation)" referred to an application to convert the reorganization of BMI into a straight bankruptcy with the debtor corporation to cease operation as a going concern and be totally liquidated.  However, Suraleb did not file the required application and when the US Trustee filed its own application, Suraleb actually opposed it.  MTW had clearly and repeatedly instructed Suraleb that both BMI and BEC were to be liquidated.  Had this occurred, cash would have been available for distribution to MTW and it would have been extricated from its trade mark and distributorship arrangements with both BMI and VEC.  Section 1.15 of the Agreement shows that MTW intended to wind down the existing business of BMI and BEC and initiate completely new business campaigns in the USA and Canada.  This is made apparent by the use of the words "immediate renewal of marketing MTW products in the USA and in Canada".  Suraleb intentionally chose a course of action at odds with MTW's expressed intent and the terms of the Agreement.  Suraleb allowed BMI's reorganisation case to go on for several years and Suraleb appropriated control of BMI and its assets as a going concern.  Suraleb left MTW in an information vacuum for years.  Had Suraleb carried out BMI's bankruptcy pursuant to Chapter 7 rather than Chapter 11, the terms of the Agreement would have been fulfilled and MTW would have been provided with everything it needed to re-start the business.  Likewise, had a similar process been executed in Canada, MTW's goals would have been achieved.  By proceeding as it did, Suraleb obtained the same assets but at a theoretically higher price, the going concern value.  The value of the assets to MTW was the same, but the fee Suraleb could claim under section 3.2.9 of the Agreement was inflated.  Thus, by extra-contractual and unilateral actions, Suraleb acted in its own interests, to the detriment of its principal, MTW.

4.44    The legal framework in Wisconsin is clear and includes a burden placed on Suraleb as agent of proving that it has paid to the principal, MTW, or disposed of assets received in accordance with its authority as agent.  Suraleb's obligation as agent to keep and render an account is tied to the burden of proving that Suraleb as agent has at all times acted within its authority and for the interests of MTW, even at the expense of its own interest.

4.45   MTW's counterclaim is in the first instance based on Suraleb's breach of contract consisting in the failure to transmit recovered funds and assets to MTW. Clause 3.2.9 (quoted on p.3) has a parallel undertaking by MTW in section 3.1.6 which helps explain the parties' intentions:

> To agree that all assets (money and assets by value) recovered by SURALEB or with its assistance from BMI and BEC reducing their indebtedness to MTW will be transferred to MTW account or under its total control with the exception of SURALEB fee in amount and in order defined in paragraph 3.2.9 of the present Agreement.

4.46   Under the Agreement and Wisconsin law, instead of wrongfully withholding MTW's property, Suraleb could have either fully performed its obligations by immediately transferring to MTW all recovered assets and then Suraleb could have brought a claim for breach of contract if payment had not been forthcoming; or Suraleb could have paid itself out of the available assets and transmitted the balance to MTW. Suraleb has itself recognised this second alternative in one of its submissions, where Suraleb asserts that the Agreement allowed Suraleb to take its payment from the assets collected in the event MTW refused to pay. Instead, Suraleb chose to wrongfully withhold the transfer of the funds and assets it received from the BMI bankruptcy and the BEC enforcement proceedings. Notwithstanding MTW's willingness to pay Suraleb its fee based on "the actual value of the assets transferred to MTW" Suraleb even refused to negotiate with MTW about the return of funds and assets. Richard Schuelke, president of Suraleb, wrote to MTW on 14 April 2003 expressing a refusal to negotiate or even discuss the valuation: "Suraleb will state one more time to Minsk Tractor Works that the amounts collected by Suraleb Inc. were awarded by the Court of each country. Suraleb will not discuss or reduce these amounts for any reason." Further, the reference to a value as "awarded by the Court of each country" is not a fair, accurate or actual valuation of the recovered assets. As agent, Suraleb owed MTW such an accounting of the actual value of those assets. Suraleb did not act in good faith. In June 2005 Suraleb admitted that it may not currently possess assets equivalent to even its USD4.4 million claim.

4.47   Further breaches involve a failure to appear in Court by agreed and specified dates, the failure to secure or even attempt to secure total bankruptcy liquidation of BMI and the failure to provide monthly reports.

4.48   The second ground for the counterclaim is Suraleb's breach of fiduciary duties. Suraleb did not fulfil its obligations as MTW's agent and attorney-in-fact. It had a fiduciary obligation under Wisconsin law to act solely for the benefit of the principal. However, Suraleb failed to act in MTW's interests, in particular by failing to protect and preserve the value of the assets recovered for MTW.

Suraleb also breached its duty of loyalty, acting in its own interests in litigating the US bankruptcy proceeding. Had Suraleb carried out bankruptcies of BMI and BEC pursuant to chapter 7 and the Canadian equivalent, such proceedings would have been promptly concluded and MTW would have received cash on account of its claims and could have purchased the physical assets and intangible property (trade marks) of BMI and BEC for much less than Suraleb purported to pay. Suraleb failed in several other respects in the fulfilment of its obligations. Most notably, it failed to provide an accounting. In spite of requests made by MTW, Suraleb never presented detailed inventories of assets received, assets remaining and never accounted for changes over the several years Suraleb withheld the assets. Suraleb's reference to an annex to an asset purchase agreement with a listing of all assets received does not meet the standard required for an accounting under Wisconsin law. There is no detail provided. The law requires more of a fiduciary.

4.49   A further ground for the counterclaim is conversion, Suraleb's unauthorised sale of real property in which MTW had an interest. Under Wisconsin law, Suraleb's powers were strictly construed and an agent exceeds his authority if disposing of the principal's assets or if unable to account for the principal's funds. In such cases, the agent is liable for conversion. First, Suraleb did not own or possess the real property for which it claimed compensation, then without being authorised by MTW Suraleb sold real estate and thereby interfered with MTW's right to possess the real estate.

4.50   Suraleb also converted property such as tractors without express authorisation and converted all Canadian assets by the wholesale assignment of all Canadian recovered assets to what is essentially a Suraleb entity. Suraleb has failed to demonstrate how this constitutes an act for the benefit of MTW.

4.51   Under section 1.15 of the Agreement, it was MTW's intention to retain Suraleb "to collect BMI and BEC debt ... with mandatory condition of transfer to MTW of the "Belarus" trade mark and other BMI and BEC intangible assets to facilitate immediate renewal of marketing MTW products in the USA and Canada." Other references in the Agreement also showed how important the return of its trade marks was to MTW. In its statement of claim, Suraleb has asserted that it obtained recovery of MTW trade marks for MTW. Although MTW is now the owner of the Belarus trade marks in the US, MTW does not possess total control as required under the Agreement. Among other clouds on the chains of title to trade marks is Suraleb's failure to formally record MTW as the sole and proper owner on record of all the various BMI trade marks in the US Patent and Trade Mark Office.

-22-

Suraleb has also failed to effect a proper transfer of the Canadian trade mark to MTW. There is an apparent unauthorised assignment of the Canadian trade mark Belarus to a party other than MTW, and even if the Canadian trade mark Belarus was obtained "for the benefit" of MTW, this is not an adequate standard of performance under the Agreement.

4.52    There are additional failures of transfer with respect to domain names, in particular www.belarus.com and www.belarus.ca.

4.53    These demonstrated breaches by Suraleb have resulted in losses for which MTW has requested to be awarded compensatory and punitive damages under Wisconsin law. The claim for punitive damages is based on breach of fiduciary duty and deliberate disregard of MTW's rights in connection with Suraleb acting in its own self-interest to the level of wilful or reckless disregard of MTW's rights.

*Further facts and circumstances*

4.54    Within the hundreds of pages of Suraleb's and MTW's submissions, there are a number of allegations of misconduct by or attributable to the other party, as well as further arguments in support and defence of each party's claims. The task of the Arbitral Tribunal, however, is not to rule on every allegation, but rather to determine whether the claims for relief are founded or not. The Tribunal will, therefore, deal expressly in this award only with those arguments, etc., which it finds to be decisive with respect to the relief sought. The Tribunal has taken into account all matters submitted to it.

**5      REASONS FOR THE AWARD**

5.1     Applicable law

It is common ground between the parties that the Agreement is governed by the laws of the State of Wisconsin, on which extensive submissions have been made by the parties. It will be applied in determining the disputes between the parties in this arbitration.

5.2     The Agreement and its performance

5.2.1   The Tribunal first wishes to address the issues arising in the context of the fulfilment by the parties of their obligations under the Agreement. Suraleb's claim is based on its alleged full performance of its obligations up to the point of tendering transfer of control and possession of the collected assets, whereas MTW not only disputes the fulfilment of

Suraleb's obligations but also alleges breaches by Suraleb which deprive it of any remuneration whatsoever for any performance that may have taken place.

5.2.2    The Agreement is based, as determined by the Tribunal on the basis of witness testimony, on a draft prepared by MTW, but it is a negotiated contract where imperfections, of which there are many, cannot be attributed to one side only. The Tribunal notes in this connection that mainly instances of lack of clarity have arisen in the course of performance of the Agreement rather than due to the sometimes conflicting provisions of the Agreement itself. Inevitably, in the course of performance or non-performance of the Agreement, certain questions were clarified through the conduct of the parties whereas in other cases a party may have missed opportunities to clarify that which was unclear from the beginning. Through acquiescence in defective or deficient performance, the parties have lost rights they might have had, had they been more diligent. The detailed analysis provided by the parties in the course of this arbitration in relation to their rights and obligations cannot do much to make up for several years when these questions were not given as much attention by them. The Tribunal has determined the essential issues in the following manner.

5.2.3    One critical point in dispute is whether Suraleb was correct in interpreting its assignment on behalf of MTW in a manner that required or permitted the preservation of the businesses of BMI and BEC and did not require the immediate bankruptcy and liquidation of those companies. In clause 1.15 the Agreement states that MTW intends to assign a company "to collect BMI and BEC debt in maximum possible amount with a Court Order about the bankruptcy and liquidation of BMI and BEC, with mandatory condition of transfer to MTW of the 'Belarus' trademark and other BMI and BEC intangible assets to facilitate immediate renewal of marketing MTW products in the USA and Canada". The Tribunal finds that although this clause is under the heading of "General Provisions", the intention expressed here takes precedence over Suraleb's specific undertaking in clause 3.2.2 "To apply to the Federal bankruptcy court in Milwaukee, Wisconsin, the USA no later than 5 (five) days since the date of signing the present agreement...issuing an application for total bankruptcy ...". This order of precedence is determined by the obvious primary interest of MTW in securing as large a recovery as possible ("in maximum amount"), which, as convincingly argued by Suraleb,

is more consistent with Suraleb's approach to the relevant insolvency and bankruptcy procedures than the immediate application for the stricter form of bankruptcy would have been. The stricter form of bankruptcy would have involved a loss of control of essential assets, such as the trademarks and websites, which would have been sold to the highest bidder. Proceeding in that manner would also have been incompatible with the stated aim of facilitating the immediate renewal of the marketing of MTW products in the USA and Canada. It is noteworthy in this connection that MTW participated in the acquisition of relevant assets from the Trustee, and MTW had the opportunity, upon receipt of information distributed to creditors of BMI and BEC to issue further instructions to Suraleb, had it so desired. The objections and claims brought by MTW in this arbitration in respect of Suraleb's failure to procure the immediate and total liquidation of BMI and BEC must be rejected as untimely and unfounded due to MTW's failure to follow up on its original intention to have BMI and BEC liquidated without regard to the negative impact on MTW's interests, if that was indeed its intention at all times. A similar undertaking was made by Suraleb with respect to BEC. Under clause 3.2.4, Suraleb undertook to apply to the court in Toronto, Ontario no later than 10 days after the date of signing the Agreement to file on behalf of MTW a petition for "total bankruptcy (liquidation) of BEC with a request to immediate arrest (blocking) of all without exception BEC assets". The implication of the language is that the immediate bankruptcy of the company could be reconciled with the arrest of assets for the benefit of MTW. MTW has not demonstrated that such reconciliation is possible or that Suraleb's pursuit of a different line of action in the insolvencies of BEC and BMI not involving immediate liquidation has resulted in any loss or was otherwise in conflict with MTW's financial interests. In any event, MTW's acquiescence and acceptance of various interim results of the modus operandi chosen by Suraleb protects Suraleb from any action by MTW for breach of the specific undertaking to procure the immediate bankruptcy of BMI and BEC, if such undertaking was ever to be understood literally.

5.2.4    The parties have charged each other with a number of omissions in the area of reporting, approvals, cooperation, support in the form of powers of attorney etc. Suraleb's complaints have been directed at MTW's failure to provide all necessary assistance under clause 3.1.1, with additional reliance on specific omissions. MTW has relied, in

particular, on Suraleb's breach of its undertaking under clause 3.2.8 to present not less than monthly reports on the fulfilment of the Agreement. Suraleb has not disputed that it has failed to provide formal reports at monthly or shorter intervals. Suraleb has alleged that it has provided adequate reports throughout, sometimes very frequently, in an informal manner by telephone and at meetings, as well as more formally in writing. The task of this Tribunal is to determine whether Suraleb's failure to provide at least monthly reports constitutes a breach of such materiality that it entitles MTW, at a point in time when Suraleb's undertakings to collect debts on behalf of MTW have been largely performed, to deprive Suraleb of the right to payment of the agreed remuneration. The Tribunal approaches this and several similar objections to the contractual performance by Suraleb against the background of the parties' mutual failures over a protracted period to live up to all of their mutual undertakings. The Tribunal does not need to go into the question whether MTW and Suraleb acted in good faith at all times in order to establish that there were instances on both sides of less than complete observance of all the terms of the contract. MTW has a mixed record of contractual fulfilment, not always resulting in timely complaints from Suraleb. In this situation the Tribunal concludes that there has been such mutual acceptance of deviations from the strict terms of the contract by either side that Suraleb's failure to provide reports as required by Agreement and indeed to fulfil other detailed obligations does not deprive Suraleb of the right to be remunerated in accordance with the Agreement, and many instances of lesser performance than that set out in the Agreement will not deprive either party of its rights under the Agreement.   Further, MTW's arguments disregard the considerable achievements of Suraleb in collecting assets from BMI and BEC, which put the non-observance of reporting duties in a different perspective.

5.2.5    MTW's case has focused on the question whether Suraleb has fulfilled its contractual obligations and is therefore entitled to a fee. Throughout this lengthy arbitration, MTW has consistently maintained that Suraleb was not entitled to issue the Bill at the time it was issued because no transfer of assets to MTW had been effected. The Tribunal will crevert to the question whether the Bill was properly issued at the time, but determines at this point that the terms of the Agreement did not require Suraleb to transfer control and possession of any recovered assets until this could be done simultaneously with the

payment for Suraleb's services being effected by MTW. Contrary to MTW's allegation, Suraleb's failure to transmit any recovered assets to MTW cannot, in the absence of simultaneous payment, be seen as a breach of the Agreement and Suraleb's fiduciary duties.

5.2.6   MTW has submitted that Suraleb's position as agent and collector of debts for the benefit of MTW imposed a number of fiduciary duties under Wisconsin law and required Suraleb to provide an accounting and that these obligations went beyond the language of the Agreement. They resulted immediately from the application of the law of Wisconsin to the contractual relationship. The Arbitral Tribunal holds that MTW's failure to require of itself as well as Suraleb the strict application of even the specific terms of the Agreement (such application may in any event have been partly impossible due to the lack of specificity and the inherent contradictions of the Agreement) precludes MTW from the ex post facto application of the detailed duties of an agent and fiduciary under the laws of Wisconsin. The Arbitral Tribunal thus finds merit in Suraleb's defences in this regard based on the application of the equitable doctrines of laches, waiver, estoppel and unclean hands. Additionally, MTW has based its claims on legal principles that are not mandatory but which apply unless there is an agreement to the contrary. In the circumstances of this case, the basic obligations of Suraleb as an agent and attorney under Wisconsin law have been varied by the parties.

5.2.7   MTW has underlined the importance of separating these proceedings from disputes outside the scope of the Agreement. MTW has highlighted arguments made by Suraleb which in MTW's submission fall outside the scope of the arbitration clause that empowers the current proceeding. The Tribunal has been alert to this issue and this award is in no way based on factors falling outside the scope of the Agreement, for instance by falling under the distribution agreement made between the parties in 2002.

5.3   The Bill

5.3.1   Having determined that there has been no breach of contract by Suraleb standing in the way of its entitlement to remuneration under the Agreement, the Arbitral Tribunal now turns to the question whether it was appropriate for Suraleb to issue the Bill on 13 February 2003, and matters arising in connection with the Bill. The Arbitral Tribunal

-27-

has already determined that, under the Agreement, it was necessary to put in place the arrangements for a simultaneous exchange of assets collected to be transferred to MTW against payment by MTW to Suraleb. It was appropriate for this process to start by the submission of a statement by Suraleb. The statement before the Arbitral Tribunal is the Bill, and MTW has objected that the assets were not adequately specified and consequently any fee coming to Suraleb was not yet earned. MTW has also objected that Suraleb had stated that the amount of the Bill, which in MTW's submission was excessive, nevertheless was not negotiable, something that in itself was a breach of contract because the Agreement foresaw valuation via negotiations (clause 4.2). In his testimony Mr R Schuelke has declared that although, when referring to the amounts collected in his letter of 14 April 2003, he stated that Suraleb would "not discuss or reduce these amounts for any reason", he was in fact prepared to negotiate as the Agreement provides, and this was borne out by the offer of a payment plan, contained in the same letter, and the formal question, also in the same letter, regarding the intentions of MTW on payment of the contract that Suraleb had completed. Suraleb contends that MTW waited for a full three years before even attempting to value the assets. Suraleb's claim for interest is based on the theory that a sufficiently detailed account was rendered in the Bill or by the time that the Bill was submitted on 13 February 2003. The critical factor in this context is, however, in the Tribunal's opinion, MTW's response to the bill, which consisted in raising formal issues relating to the legalisation under the Hague Convention of the documents presented by Suraleb. MTW's position was set out repeatedly and with increasing emphasis in protocols of negotiations held between MTW and Suraleb between 17 and 21 February 2006. Apart from a reference in the last protocol, relating to the negotiations on 21 February 2003, to MTW's decision to estimate the payment to Suraleb judging from the actual market value of the assets, all comments relate to formalities required by MTW regarding the legalisation of the documents submitted by Suraleb. Although, as will be set out later in this award, the figures underlying the Bill needed corroboration in the circumstances, and notwithstanding MTW's reliance on the duties of an agent to provide proof, documentation and accounting, the Arbitral Tribunal finds that MTW has not acted with sufficient diligence and focus on the resolution of the genuine business issues arising in the delivery of the results of Suraleb's activities under the Agreement. Considering that Suraleb did provide

extensive documentation in respect of the assets collected from BMI and BEC, it was incumbent upon MTW to object and enquire with specificity, at the time, to the extent that the documentation was insufficient or unclear. Further, as far as has transpired, MTW never expressed interest in taking possession of the recovered assets against simultaneous payment of *any* fee to Suraleb. Based on these considerations, the Bill triggers MTW's obligation to pay and interest on the debt should reasonably be payable from a date 60 days after the date of the Bill, i.e. interest shall be payable from 13 April 2003. In its Defence and Counterclaim, MTW has requested the dismissal of Suraleb's claim for pre-award interest on the ground that it was introduced too late. However, Article 20 of the Rules provides that either party may amend or supplement its claim unless the arbitral tribunal considers it inappropriate to allow such amendment having regard to the delay in making it or prejudice to the other party or any other circumstances. MTW has demonstrated no prejudice it may have suffered due to the delay. A claim for interest is foreseeable at any time, especially when limited to statutory interest. Hence, the Tribunal has found no reason to dismiss the claim for pre-award interest.

5.4     The value of the collected assets

5.4.1     The U.S. asset values on which Suraleb based the Bill are set out at 4.25 above. The Agreement provides that if the parties cannot agree the value of goods recovered in kind, the valuation will be performed in accordance with the chosen method of resolving disputes. During the arbitration, the valuations carried out by each party have been relied on extensively by them, and during the main hearing, much time was spent comparing the reports of the valuation experts, Mr Horsley and Duff & Phelps, which their respective appointing party adopted as part of its case. The Arbitral Tribunal will deal with each item in turn. This will also produce a simplified list of the asset categories that are to be accounted for and delivered by Suraleb to MTW in return for payment of the fee.

5.4.2     The stated cash asset of USD675,000 is accepted because, to the extent it was not present when the Bill was presented, it was permissible to take the full amount (although understated by USD10,000) into account because payment was reasonably foreseeable on the date of the Bill. It appears that in his report, Mr Pfeiffer excluded the incoming

cash because the actual date of payment may have been after the date of the Bill. However, in several other evaluation contexts, input from the year 2003 has been used in both parties' valuations, and the Arbitral Tribunal finds that it would be wrong to exclude incoming payments from the valuation on the grounds that the date of payment may have been as late as April 2003 with respect to certain amounts included in the cash sum of USD675,000 included in the Bill. Alternatively, this would have been a receivable.

5.4.3   The accounts receivable are to be included in the valuation in the amount set out in the Bill (USD368,000) because the sum is supported by both valuations. The lower value stated by Duff & Phelps in its reports is due to timing issues of no substantive character for the valuation. In the unanimous opinion of the valuators relied on by both sides, an accounts receivable reserve of USD149,787 is to be deducted. This leaves a net amount of recovered assets under the heading of accounts receivable of USD218,213.

5.4.4   We turn now to the recovered U.S. inventory of tractors and parts. In the Bill this head of the claim is listed as inventory of USD6,864,000. The tractor inventory varies in value, according to the valuations submitted in the arbitration, between USD1,200,000 (Horsley 8 March 2005) and USD588,450 (D&P 8 December 2005). A number of assumptions have been made in each successive valuation, with explanations and arguments added in a dialectic process in which the Arbitral Tribunal has found it most appropriate to accept the Horsley adjusted claim of 2 December 2005 in the amount of USD890,000, in particular because the Arbitral Tribunal finds it demonstrated that the cost of preparing tractors for sale has been overstated by Duff & Phelps. The next element of the inventory valuation involves the parts inventory. The approach taken by Mr Pfeiffer in the Duff & Phelps valuation is to a large extent based on general models, general industry figures, and basic accounting materials, whereas Mr Horsley has studied the specific business environment affecting Belarus tractors and the specific demand for spare parts for them in view of their distribution, their useful life, the realistically achievable gross margin, etc. Even so, Mr Horsley's valuation is a composite product averaging three inventory valuation methods. This produces an adequate estimation of the value of the parts inventory and hence the Tribunal rules that the value shall be

USD2,530,000. When the tractor Inventory of USD890,000 is added, a total inventory value of USD3,420,000 shall be used as the recovered value.

5.4.5    There is unanimity between the valuations in respect of prepaid expenses of USD33,286.

5.4.6    The value of the real estate in the USA deviates, when assessed by either side's expert valuators, from the value of USD1,107,000 stated in the Bill. In the circumstances, with both parties requesting the application of real and proved values, which is their right in the situation where no agreement has been reached, but the value has to be determined through arbitration, the Arbitral Tribunal has assessed the experts' testimony and their respective valuation reports and determined that the most reliable value of the real estate in the USA is that determined by Mr Horsley in his final report, which is USD1,825,000. This value shall be used for the determination of Suraleb's fee.

5.4.7    Furniture and equipment were listed in the Bill at USD71,000. Duff & Phelps has accepted this figure but Mr Horsley's adjusted valuation of 2 December 2005 assesses the value at USD251,030 under the heading of Capital Assets. USD71,000 was the value used by the Bankruptcy Trustee, which in Suraleb's submission would typically be a minimum valuation. After a detailed count and valuation of fixed assets in use at 11 April 2002 prepared by company management and reviewed by the company's independent accountant, the revised value is USD251,030 which Mr Horsley accepts as the reasonable fair market value in place to the business on a going concern basis at 11 April 2002. Considering the qualifications added by Mr Horsley, the Arbitral Tribunal has determined that the fair value for the purpose of a settlement between the parties shall be USD150,000.

5.4.8    Both valuators have had difficulty dealing with the value of the investment in 33% of the ownership interest in IKAR Holdings AG. It has been submitted, and not disputed, that this is an investment holding company located in Zurich, Switzerland.  Based on historical financial statements from 1999, the underlying assets include an investment in ATEX, the Russian entity that owned shares in BMI and BEC and had entertained business relationships with MTW. IKAR also had other holdings in the tractor business and in real estate. Mr Peiffer, after seeing the information contained in the 1999 financial

statements for IKAR, determined that he could only assign a *nil* value to the holding. Mr Horsley looked into the shareholders' equity at 30 September 1999, which was CHF7,020,000, reduced it by demonstrated running expenses, assumed no further change of activity, and calculated the USD equivalent value of the 33% ownership interest at USD1,440,648, close to the book value of USD1,466,000 as used by the Trustee in Bankruptcy and by Suraleb in the drafting of the Bill. The Tribunal takes into account that the holding in IKAR Holding AG is related to MTW's business or business circles. Although MTW very likely has had better access to more recent information about the value of an ownership interest in IKAR, MTW has provided none. The Arbitral Tribunal therefore finds that the value of this investment, particularly when considered transferred into the hands of MTW, should be the same as stated in the books of BMI, i.e. USD1,466,000.

5.4.9    The final item to be included in the valuation of the US assets is goodwill and trademark, listed together at USD3,300,000 in the Bill.   Such intangible assets are notoriously difficult to value.   At the same time, there is widespread agreement in contemporary business that intangible assets may be a very significant element in the value of an enterprise although typically not listed, or capable of being listed, in the standard balance sheet.   In this case, the Tribunal needs to put a fair and realistic value against each recovered asset. It has been common ground between the parties, during the process of recovering assets for the benefit of MTW, but not always in the arbitration, that especially the Belarus trademark adds value to the business. With respect to the goodwill attaching to the existing operations of BMI and BEC it is implicit in MTW's wish to renew the business that MTW preferred not to start it from scratch without the benefit of an existing dealer network, experienced staff, existing facilities, etc.   Rather than determining separate values for the goodwill and trademark attaching to the US market and to the Canadian market, the Tribunal finds it demonstrated that the combined value of goodwill and trademarks in the United States and in Canada should fairly be recognised in the sum of USD1,000,000 for the two markets together.

5.4.10   With respect to the Canadian operations, there have been fewer instances of disagreement between the several valuations prepared over time by the two valuators. The greatest discrepancy relates to goodwill, valued at CAD2,000,000 by Mr Horsley but

this asset has been combined with US goodwill in the Tribunal's findings as indicated above. For all other items together, the difference between Mr Horsley's valuation (both March and December 2005) and the Duff & Phelps valuation (both November and December 2005) is relatively small at CAD225,000, in round figures. The Arbitral Tribunal is convinced that Mr Horsley's approach to inventory valuation is the better one in that it takes the nature of tractor distribution and replacement parts distribution by BEC into account, including the development of sales prices, inventory write-off expense and past company history. Mr Horsley's valuation having been found justified, the inventory value to be used shall be CAD4,600,353. When other assets are added (cash, accounts receivable, prepaid expenses, Simpson Wigle account and capital assets), the asset subtotal for Canada becomes CAD6,525,763. In order to determine the net asset value for Canada it is necessary to deduct liabilities attaching to the business. Because the Tribunal accepts the valuation date of 5 September 2002 the Arbitral Tribunal also accepts Mr Horsley's figure for accounts payable at that date of CAD306,287 rather than My Pfeiffer's figure which relates to the year end balance at 31 December 2002. The exchange rate of CAD1.5672 to USD1 shall be applied when converting to US dollars. The computation, based on the foregoing, is CAD6,219,476 divided by 1.5672 = USD3,968,527.

5.4.11    No value has been assigned respecting the alleged asset called ATEX. It appears to have been included in the asset value underlying the Bill. The Bill was unspecified in respect of Canadian assets but has been broken down by Mr Horsley into several items including a CAD1,000,000 sum which, as reported by Duff & Phelps, relates to a transaction involving ATEX which appears to have been insufficiently documented in order for it to be recorded as resulting in an asset, at least for the purposes of this arbitration. The Tribunal assigns a nil value to this item.

5.4.12    There are liabilities to be deducted from asset values recovered relating to BMI. The adversarial valuations agree on accounts payable of USD78,625, accrued liabilities of USD89,137 and an accrued tax lien of USD750,000, a total of USD917,762. Duff & Phelps has presented a valuation as of 1 October 2005 which includes long-term debt of USD2,489,180. Considerable attention was given to this controversial item in the course

of the hearing, but it may be left aside here because it has not been demonstrated to be relevant for the valuation as of 2002 which is to determine the fee earned by Suraleb.

5.4.13   It is now possible to list the sums that will determine the net total value for the purposes of clauses 4.2 and 3.2.9 of the Agreement, as follows:

| | |
|---|---|
| Cash | USD675,000 |
| A/R | USD218,213 |
| Inventory | USD3,420,000 |
| Prepaid expenses | USD33,286 |
| Real estate | USD1,825,000 |
| Furniture and equipment (capital assets) | USD150,000 |
| IKAR | USD1,466,000 |
| Goodwill and trade marks | USD1,000,000 |
| BEC | USD3,968,527 |
| Total value of recovered assets | USD12,756,026 |
| Less U.S. Liabilities | USD917,762 |
| Grand total | USD11,838,264 |

| Fee computation | USD |
|---|---|
| 3,000,000 (50%) | 1,500,000 |
| 8,838,264 (20%) | 1,767,653 |
| Total | 3,267,653 |

## 5.5   MTW's Defence

5.5.1   For the reasons set out above, Suraleb's claim is to be granted in part. The Tribunal will revert to this in the next subsection of the reasons for the award.

5.5.2   MTW has asked that the amount of USD638,894.43 shall be subtracted from any claim awarded to Suraleb. This is the mirror image of the USD585,000 which by Suraleb's admission is to be deducted from the sum that is due to Suraleb. Except with regard to the management fees, which will be dealt with below, it has not been demonstrated (not even by the reference to a slightly larger sum in the correspondence between counsel)

that Suraleb has received payments on account of the fee it has earned, beyond the USD585,000 admitted by Suraleb.

5.5.3    With respect to further subtractions to be made from sums awarded Suraleb the Tribunal finds that Suraleb has been obliged and entitled to manage the collected assets, pending a resolution of the question of the fee owed to Suraleb and that, as far as demonstrated in the course of the proceedings, the payment to Simpson Wigle (Canadian Lawyers), the various cash withdrawals that have been made from the bank account of BMI and an account held by Suraleb as agent for MTW, and any loss of asset value resulting from the exchange of real property, etc., all fall inside the limits of the transactions that must be deemed permitted to Suraleb in view of the broad assignment it had been given. The situation is different with respect to management fees it has paid itself. It is true that Suraleb remained tied to the assignment for MTW for much longer than could have been expected and that actions of MTW and decisions made by MTW carry much of the responsibility for this state of affairs. It must be accepted that the costs of running the conglomeration of assets held for MTW in the United States and Canada may be charged to the business as a going concern, but in respect of the pure remuneration of Suraleb the schedule of fees contained in the Agreement should prevail. To the extent that Suraleb was patient of delays by MTW, this may be explained by business reasons, as an investment in Suraleb's future as a potential distributor for MTW or as a speculative decision to await changes in operative decisions taken or to be taken by MTW. Further, Suraleb will be granted pre-award interest which is sufficient to compensate Suraleb for the late payment of its fee. For all of these reasons, the Tribunal rules that USD355,500 shall be deducted from Suraleb's fee under the heading of restitution of management fees. On the other hand, the staff bonus of USD15,000 is considered to be a normal business expense to be borne by MTW.

5.5.4    With respect to the USD160,598 in disbursements to named individuals belonging or close to Suraleb's management, the Arbitral Tribunal finds that Suraleb has not demonstrated that this sum, advanced by MTW but undisputed by Suraleb, forms part of the cost of maintaining MTW's business, pending a final resolution of mutual accounts. Along with the management fees these disbursements shall hence be deducted from the sum to be awarded for payment to Suraleb.

5.6     MTW's counterclaims

5.6.1   MTW has asked for an award ordering Suraleb to transfer control to MTW of all of the collected trademarks and domain names as well as other collected assets under Suraleb's control. This is what Suraleb is required to do, against payment of its fee, and, subject to intervening variations in the collected assets, it will be so ordered. It follows from the conclusions drawn in 5.5.3 that the assets to be delivered by Suraleb against payment by MTW are the assets current at the date of such exchange although the Tribunal's findings as regards Suraleb's obligations in respect of the assets do not extend beyond 20 December 2005.

5.6.2   MTW has requested compensatory damages and punitive damages for breaches by Suraleb. Damages should be awarded if, on the basis of the several legal grounds advanced by MTW, the Tribunal finds that Suraleb's contractual performance has been sub-normal in the circumstances. In particular, due to the emphasis on the loss or consumption or deterioration of assets over time, the question is whether Suraleb has performed with sufficient diligence. The Tribunal concludes that this has been the case. Where MTW has been able to point to legal standards that are very exacting vis-à-vis an agent or generally a contracting party in Suraleb's possession, the highest standard is often applicable only unless otherwise agreed, and the Tribunal finds that with the involvement of representatives from either side, having adequate authority to conclude and amend agreements, the standards for the performance of Suraleb have been modified over time. The occasional insistence by MTW on Suraleb's observance of one contractual duty or another has not been effective as a method of redressing, from MTW's point of view, a complex contractual situation, extending over a period of several years, during which certain of MTW's expectations as principal, stated during the arbitration, have not been consistently declared and defended by MTW. MTW has itself not lived up to the letter and spirit of the Agreement at all times. For these reasons, the Tribunal finds and holds that no damages are due to MTW.

5.6.3   Specifically, MTW's claim for compensatory and punitive damages relates to the loss of value experienced in respect of the collected assets between 2002, the time of the Bill, and 2005, the time of the trial. The Tribunal has determined that no damages are payable to MTW, and the Tribunal has held that Suraleb legitimately used collected

assets for the purposes of the ongoing business. The passage of time and any resulting loss suffered by MTW have not been shown to be caused by any breach of contract by Suraleb. The Tribunal understands that the case as brought by MTW in its counterclaim was intended to achieve a final financial settlement, but the contractual and procedural situation has not permitted MTW to achieve that result, if that was indeed MTW's intention. Purely by way of obiter dictum the Tribunal remarks that the identification of the individual assets to be transferred (except in obvious cases such as trademarks and websites) remains to be carried out by the parties when they make arrangements for the transfer of (control of) collected assets against payment of Suraleb's fee.

5.6.4   By way of further relief, MTW has requested the payment by Suraleb of the fair market value of collected assets that are not transferred to MTW at the date when those missing assets would otherwise have been transferred. The Tribunal holds that this claim is dependent of an uncertain future event and must hence be dismissed (without prejudice) at this time.

5.7     All other requests.

5.7.1   For analogous reasons, all other substantive and procedural requests must be denied.

# 6      COSTS

6.1     Both parties have made submissions on costs. They have had an opportunity to comment on each other's claims for costs. Suraleb has claimed legal fees of three firms of USD718,888.64 plus their expenses of USD128,321.91, a total of USD847,210.55. Suraleb has also claimed a sum of USD137,783.93 as fees of Bruce R. Horsley & Associates, valuation experts, plus expenses of USD2,230.13, a total of USD140,014.06, with a grand total of USD987,224.61. MTW has claimed USD2,119,740.92 as fees of their three law firms, plus expenses of USD135,521.26, a total in legal fees and expenses of USD2,255,262.18. MTW has also claimed USD170,197.50 as the fees of Duff & Phelps plus their expenses of USD13,854.28, a total of USD184,051.78, a grand total of USD2,439,313.96.

6.2     MTW has declared that, for practical reasons, it accepts Suraleb's costs submission as reasonable. Suraleb, on the other hand, has opposed MTW's costs submission on several grounds. The Tribunal has taken into consideration that although Suraleb will be awarded less than it has claimed, Suraleb is the winning party in all essential matters of principle. Considering

that Suraleb will not be ordered to reimburse any of MTW's costs, no decision is called for in respect of the question of whether or not they are entirely reasonable.

6.3   MTW had demanded costs sanctions against Suraleb based on the manner in which it has conducted the arbitration. The Tribunal has not been convinced that there are sufficient grounds for costs sanctions against Suraleb and dismisses MTW's demands accordingly.

6.4   To the extent that MTW has been successful in its counterclaim, this is the mirror image of the performance, by delivery of collected assets, that is set out in the original contractual arrangement. This does not warrant that any compensation for costs is granted MTW.

6.5   The costs of arbitration shall in principle be borne by the unsuccessful party (Article 40 of the Rules). MTW is to be deemed the unsuccessful party and hence shall bear all of the costs of arbitration.

6.6   Based on the time and effort spent by the arbitrators, the Tribunal has determined that the costs of arbitration shall be as follows:

|  | Fees | Expenses | VAT |
|---|---|---|---|
| Per Runeland | SEK 1,050,000 | SEK 147,017 | - |
| Bo G.H. Nilsson | SEK 525,000 | - | SEK 131,250 |
| Rolf Olofsson | SEK 525,000 | SEK 28,273 | - |

The parties shall be liable jointly and severally for such costs. As between the parties they shall be ultimately borne by MTW. They will be covered out of the advances paid to the arbitrators.

6.7   In respect of the costs of arbitration, the following sums are due to Suraleb from MTW:

Costs of legal representation and evidence                                          USD987,224.61

Reimbursement of advance paid to the                                          SEK 1,203,761
Tribunal

7   **AWARD**

7.1   Production Association "Minsk Tractor Works" shall pay the sum of 2,166,555.00 United States Dollars to Suraleb, Inc. against delivery of the assets collected by Suraleb, Inc. on behalf of Production Association "Minsk Tractor Works", as those assets are currently.

7.2    Suraleb, Inc. shall deliver to Production Association "Minsk Tractor Works" assets collected by Suraleb, Inc. on behalf of Production Association "Minsk Tractor Works" as those assets are currently against payment of 2,166,555.00 United States Dollars.

7.3    Production Association "Minsk Tractor Works" is ordered to pay simple interest (not compounded) to Suraleb, Inc. on the sum of 2,166,555.00 United States Dollars from 13 April 2003 until the date of this award at the rate of 5 percent per annum.

7.4    Production Association "Minsk Tractor Works" is ordered to pay to Suraleb, Inc. the sum of 987,224.61 United States Dollars as compensation for the cost of legal representation in this arbitration.

7.5    Production Association "Minsk Tractor Works" is ordered to pay to Suraleb, Inc. the sum of 1,203,761 Swedish Kronor representing costs of arbitration.

7.6    Suraleb, Inc. shall be free to seek post award interest under applicable rules.

7.7    The costs of arbitration and the liability for them shall be as set out at paragraph 6.8 above.

7.8    All other claims are denied.

---

A party may bring an action before Stockholms tingsrätt against the arbitral award respecting the payment of remuneration to the arbitrators. Any such action must be brought within three months of the date when the party received the award.

Bo G.H. Nilsson, Arbitrator          Per Runeland, Chairman          Rolf Olofsson, Arbitrator